Case 12-1100 et al. White Stallion Energy Center LLC Petitioner v. Environmental Protection Agency Mr. Lindstrom for Certain State and Industry Petitioners Ms. Talbert for EPA Respondent Mr. Collins for the Industry Respondent Intervenors Ms. Hoffer for the State and City Respondent Intervenors and Mr. Donahue for the Environmental and PHO Respondent Intervenors EPA is a creature of statute. The only authority it has is the authority that has been given by Congress. In this case, Congress imposed a substantive precondition on its exercise of that authority. It could not regulate power plants until it first made an appropriate and necessary finding. And we now have confirmation that that appropriate and necessary finding must include a consideration of costs. So EPA has still not, to this very day, fulfilled that substantive precondition. As of today, it has never completed a finding that's appropriate and necessary that includes a consideration of costs. So EPA, therefore, does not have any authority to promulgate the rule and didn't have authority in 2012. And that means that the rule must be vacated. The primary argument we're making is that you don't need to reach the allied signal line of cases at all because this is a different situation where there's no authority. In this case, it has on many... But it's kind of a combination of an authority issue and a State Farm issue, right? Because the Supreme Court said cost has to be a factor, and that's the authority issue. But then once you have it as a factor, how they apply the factor, how the agency applies the factor, that's really going to be a State Farm reasonableness. Did they balance the right factors? Did they do it appropriately? So I understand why you're saying it's an authority issue, but it's going to be next time around a State Farm kind of issue. So the question at this point in this odd posture is, you know, is there a chance they'll come to the same bottom line and be upheld in that bottom line, I suppose. Well, I think the question's a little bit different because we're talking about... Chance is not the right word, I understand. But we look at the likelihood. Well, I think in the future there will be an arbitrary and capricious component of the case after they've actually done that step by considering cost. But since they haven't yet, the deficiency that we're talking about is the fact that they didn't have authority in 2012, that they don't have authority today, and they won't have authority until they actually make the finding. So that's... Wasn't the same thing true in the Sugarcane v. Veneman case? The Administrative Procedure Act says an agency has no authority to issue rules until they do notice and comment. You don't do notice and comment, you don't have any authority, you can't issue a rule. And yet we remanded without vacatur, and we've done that many times. I think notice and comment is different because notice and comment, for one, is a procedural as opposed to a substantive authority, but it's also not even a mandatory precondition under the APA or under the Clean Air Act because both of them recognize that it's something that the agency can set aside if it has good cause. If it makes a finding of good cause and publishes on the record, which it didn't do in that case. And without doing that, we expressly said that they violated the APA in that case, and yet we remanded without vacatur, and we've done that many times. And there are also many cases where there have been notice and comment failure that have actually resulted in vacatur? Yes, yes. But I understand that, but I think that just goes to the point that this is an Allied Signal-like case. There's nothing special about this case. In the other cases where, like the EME Homer where he said it was fundamentally inconsistent with what the Supreme Court had said, in North Carolina where we said there were fundamental flaws, in all those cases, we then have to address the remedy question. But I don't see why we don't have to address it. You say we don't even have to address the remedy question here, and I'm not sure I understand why. That's true, and there's a number of cases where this Court has said there's a lack of authority and therefore we vacate. So, for example, in one of the NRDC versus EPA cases, this is one from 2007, the Court said, we conclude that EPA's definition of commercial or industrial waste is inconsistent with the plain language of the Clean Air Act, and the definition's rule must therefore be vacated. An even more on-point example of this type of reasoning, there's no Allied Signal analysis at all. I'm not sure what you're saying, other than that if you're saying our case law is inconsistent, well, that's interesting, but that doesn't help us resolve this particular case. It's true. It may also be true. I'm trying to make a slightly different point, which is that this Court has, a number of times, recognized that a lack of statutory authority leads to the conclusion that you must vacate. But that's where we're saying, I think, there's a lack of authority to do what they did. And I think the posture we're in now is that EPA's been told there's a lack of authority to do what you did without considering cost, right? And so they've said, okay, when we consider cost and looking, because we know in rough shape the costs and benefits, we're going to come out at the same bottom line, and therefore don't vacate. Without prejudicing your ability to challenge that, of course, in the future, but making the judgment that we do under Allied Signal, you know, they're saying we're going to come out in the same bottom line. So it's not that we said or the Supreme Court said you don't have authority to do what you did. It's you don't have the authority to do what you did without considering this factor first. Right, which they still do. Which strikes me as a little different. Well, I think the fact that there's a substantive precondition that they haven't met means that they haven't yet acquired the authority. So the fact that they are in the future going to consider cost, and it's possible without prejudging the outcome, presumably they're going to look at this carefully, that they could ultimately reach the same outcome. But that's just like the hypothetical we used in our brief about the fact that a court might reach the same conclusion later if it acquired jurisdiction. It doesn't mean the fact that it initially didn't have jurisdiction is not a problem authority. And I think I'd like to return to the notes and comment point, because that's an important one, because I think there is a difference between something that's under the APA versus something that's under the underlying statute that is granting the substantive authority. The APA is a procedural statute that's focused on making sure they go through certain steps in the process of exercising their authority. But it's not about whether or not they have authority the same way that the underlying statute is. And this is a particularly clear example, because of the statutory language we're talking about, where, as the Supreme Court decided, it's something that they have to do before they're allowed to impose the rule. And so this seems to me, comparing it to prior precedent of this court, a lot more like the New York versus EPA decision from 2005. Suppose, I might be taking on a different point, so I didn't mean to interrupt, but between now and April 15th, what will be different if it's vacated, as opposed to if it's not vacated from the point of view of your side of the case, what people will do on the ground? What are the practical differences? So you're asking about the practical differences? Well, the practical difference is it's going to impose $158 million on an annual basis. It's $158 million of compliance costs. The EPA acknowledges that's their estimate. They're going to be imposed from running these controls. And that's $158 million compared with the, again, the annual basis of $4 to $6 million of hazardous air pollutants that are being reduced. Well, that gets into the co-benefits issue. We'll get to that. But I just want to know exactly what would be different. What would people do differently tomorrow if it's vacated than they're doing today? Well, that's the tough part about this sort of rule, that it takes so much lead time to comply with it. So hasn't most of that been done? A lot of it has been done, but there's still 40% of the plants that have extensions, as the state respondent's brief acknowledges. So there's still a lot of people who have extensions. I assume they're still going through the process and they're trying to comply with the rule. But if it was vacated, they know it's going to be reissued, say, April 15th. Their prudent investment would suggest keep going. Right. And it strikes me as an ironic component of this case that the fact that they've already spent this money under the rule that was unlawful from 2012 is now being held against them. I agree with that. So there's a lot of things about the pace of litigation versus the pace of investment and how rules have lead time. I get all that. But just in the precise posture we're in, will something really change on the ground if it's vacated rather than just held in place until usually April 15th? Right. Because that's their prediction? Yeah. And, yes, I mean, this compliance cost is a significant amount of cost, and it's severely out. I mean, you said that it gets into the underlying issue of co-benefits. But when we're talking about what's appropriate to consider as one of the disruptive consequences, it seems like that issue is somewhat implicated. If most of the plants already have the installed controls, what are the costs? You mean you just want to take the controls off during the four months? It's not physically removing them. It's not operating them. Right. You just don't want to operate them for the four months. Is that right? Because we think it would be they shouldn't have to comply with $158 million of compliance costs when, yes, I mean, they shouldn't have to operate them. Well, is $158 million the capital costs or is it just the cost of running? That's the cost of running them. So who do you represent here? According to the industry respondents, you really only represent a single generator that's actually existing. That's Oak Grove, which operates just one gigawatt plant. And they say that they represent 75 gigawatts worth, and they think that the disruption would be enormous for the electrical industry. But as to the one company you represent, how much is it going to cost that one company? I also represent the states. But the states aren't running the plants. That's true. We're going to talk about what their injury might be. Right. But the briefs are all aimed at the costs at power plants, and yet you only represent a single one and a very small one. And the people who represent 75 times as much power say they don't want vacatur because they will be injured worse during this four months or a longer period. What do you say to that? Well, I think that actually ties back to the point I made before, that they've already been injured. The people I'm representing have already had to expend all of this under the rule when the rule was enacted without authority. But the question is, what can we do about that? If we're talking in four months, you may be back under the rule again. So the real question is, what happens during this four months? We can't help you with what happened in between. So this is a marginal cost question, as an economist would say. That's fair enough, Your Honor. And I'm here more out of the rule of law concern. I mean, that's the real thing that's driving our interest in this case. But the second allied signal factor is the disruptive consequences. It is. It's kind of an amorphous practical effects on the ground kind of consideration, I suppose. That's true. And I think the focus should be not on that second factor, but on the seriousness of the deficiency if you're applying the allied signal test, or on the fact that they didn't have authority in the first place. But on the seriousness of the deficiency point, we've said in those other cases I just mentioned, these were fundamental flaws, flatly inconsistent with the statute, et cetera. And yet we still looked at the second question, which was the degree of disruption. And the people who represent most of the industry here say that this would be extremely disruptive if we were to do anything more than remand right now. And you have one plant. And I appreciate the concern about the one plant, and I appreciate the rule of law question, but in many ways we're in an equitable situation here. We have to decide what to do during this period. Well, I think that the legal analysis informs the equitable considerations. It seems to me that there's an equitable component to the fact that this has been imposed unlawfully on them in the past, and that's how we're in that situation. It seems to me that if you're looking at the equitable picture, you want to look at the entire equitable picture, and that's part of it. On your rule of law point, there's obviously a strong argument that others have made that it should always be vacated. That's not where our case law stands. And the Allied Signal test does seem, to pick up on Judge Garland's point, kind of an equitable injunction-like standard where you balance the likelihood of success and harms, kind of slide and scale. Do you disagree with that reading of Allied Signal? No, I do agree that that's what the Allied Signal test is focused on. But there's also a lot of cases, again, where this Court has not applied the Allied Signal analysis when there's a lack of authority. And I've got an example that's similar to this one because it's a Chevron Step 1 analysis. So that's the New York v. EPA case that I was mentioning a minute ago. And the Court's analysis on what to do was, we hold that EPA lacks authority to promulgate the clean unit provision, and we vacate that portion of the rule as contrary to the statute under Chevron Step 1. So it's not, I don't think, the case that you're always in the context of Allied Signal. Allied Signal is something that applies in certain circumstances. We're not disputing that. We're not saying that it's not a proper standard to apply in a number of circumstances. Our point is that when there's a fundamental lack of authority, it's as if a district court acted without authority, and then on appeal you said there's no jurisdiction, and so you left the permit injunction in place. Isn't every time we think that the agency acted in an arbitrary and capricious way in examining Congress's instruction as to what it should do, doesn't that mean it's without authority? That is, in this case, you could say that they acted by not considering cost, but you could equally say, as you did before, that not considering cost is acting arbitrarily and capriciously in terms of interpreting the words. That we do all the time. And if an agency acts arbitrarily and capriciously in interpreting Congress's words, whether we call that Chevron or we call that State Farm, in a way it's acting without authority. The Supreme Court's decision about whether Chevron applies to so-called agency jurisdictional questions makes quite clear that it's very difficult to distinguish those two points, jurisdiction versus authority, authority versus acting arbitrarily and capriciously. I appreciate the point of trying to put this into that box, but I think this is a pretty hard box to define. I agree it's hard to define because there are many limitations on agencies, but I guess if this case doesn't fall on the side where a lack of authority, which is a substantive precondition, then it seems to me there wouldn't be any case where you would directly. I don't agree with that because the statute, I'm repeating myself now, but if we say, as we sometimes do, the statute does not give the agency authority to do X, the reason we vacate, I believe, is there's nothing they're going to be able to do about that. And so there's no reason to remand. However, if we say the agency may have authority to do X, but they didn't explain it sufficiently, they didn't consider a relevant factor, we're going to send it back to the agencies. In the way we remand a district court sometimes for them to explain sentencing decisions or something, or consider factors that weren't considered, that's a different kind of case. So I don't think it's correct to say if we don't vacate here, we would never, there's no case to vacate. I guess my only point is that this is a clear instance where Congress told EPA you have to do something before you're allowed to regulate, and they have not done that. So just as a matter of following the rules or the language of that statute, which both the agency and this court should do under CHEPRA, when it strays far beyond the bounds of the statute, which is what the Supreme Court said, then it should be vacated. And whether it's mandatory or not, this is such a serious deficiency that even under the Allied Test it should fall under that. There's one of your cases where you mentioned that if the deficiency is very serious, then you don't give as much weight to the secondary part of the test. And that's the Comcast case, I believe. But, as again, we've said that the deficiency in North Carolina was fundamental. It was fundamentally flawed. I don't know what fundamental means, by the way. Well, I don't know what it means either, but we did go on for several pages explaining those fundamental flaws. That's true, Your Honor. In North Carolina. In fact, we said very little will survive on remand in anything approaching the recognizable form. I guess that's a test. That's the point I'm making about. That's a test of fundamental. Well, and I guess the other point about the North Carolina case is that's where we initially did what I'm asking for in that case, which was to vacate it because it went beyond the statute. And then everybody, the EPA moved for remand without vacature, and nobody objected. Nobody made the argument I'm making. That case didn't actually decide this issue, so as a precedential. What happened in North Carolina, just to speak up for the North Carolina panel, was the panel thought there were fundamental problems with EPA's approach, and it vacated. And then EPA and others asked the Court to reconsider because of the consequences of vacating, that the states had been for years planning on the basis of certain assumptions underlying this rule. And the Court reconsidered, changed its position, and remanded without vacating. And so we're having that same discussion now that in North Carolina we had on the motion for reconsideration. Right. And as I understand it, nobody raised the argument I'm making in the remand consideration. Everybody agreed it should be vacated, so I'm just making a point that it's not precedentially binding because that issue wasn't actually decided in that case. Okay. Do you want to reserve the rest? If I'd like to reserve it, let her stop here. Okay. We'll hear from the respondents who have apparently divided their time against the best normal guidance to all respondents not to divide your time because then you don't have a chance to answer the judge's question. But we'll start with the EPA. May it please the Court. My name is Stephanie Talbert, and I represent EPA in this matter. With me at council table is Eric Hustetler from DOJ and Petra Ting from EPA, and also Paul Versace is here from EPA as well. In Michigan against EPA, the Supreme Court identified a single limited deficiency with the mercury and air toxic standards. It said that EPA has to give at least some consideration to cost when it makes its appropriate and necessary finding under Section 112 and 1A of the Clean Air Act. Importantly, the Supreme Court declined to have an EPA's discretion in how to do that, and today I'd like to address two points in support of our motion for remand without vacature so that EPA can go back and address that limited deficiency on remand. First, allied signal is the law of the circuit and must be applied, regardless of whether the court applies the EPA standard of review or the Clean Air Act standard of review to this issue before the court. And second, the application of the allied signal factors weigh heavily in EPA's favor and yields a clear result. Could you address a third question, which is it may well be very important to us how long this is going to take, and the briefs talk about as near to April 15th as possible. And now you've actually done something that looks like you're moving towards it. Within a few minutes of our issuing an order for oral argument, you published it. I assume that it was actually published. It was published on December 1st. So we know that if we order oral argument, we get the government to move. That's very good. We had planned to file that 28-J before we saw the order. Post hoke ergo procter hoke. Okay. So how confident can we be now that this will be done by April 15th? EPA is on track to meet that intended deadline. The reason why EPA was not more forceful and used words like plan and aim is that there are certain things outside of EPA's control, like the number of comments it's going to receive and the nature of those comments. So while it is preparing to meet that deadline and it has done significant work in just the five months that it's been since the decision came out, EPA is on track to meet that intended deadline. Next I'll move to my first point, which is that Alec's signal is the law of the circuit and must be applied. As Judge Garland said earlier, sugar cane growers address this precise argument that joint petitioners are making that the APA requires vacature without any analysis of the allied signal factors, and this court said, but that is simply not the law, and then went on to apply allied signal. So it must be applied in this case, even if this court treats the issue as coming under the APA rather than the Clean Air Act standard of review. So the first allied signal factor, whether the agency chose correctly or the extent of doubt whether the agency chose correctly, the seriousness of the orders deficiencies, depends a little bit on evaluation of whether you're going to be able to reach the same bottom line after considering costs, and obviously the agency is planning to. But then do we look at, for example, in the oral argument in Michigan, Chief Justice Roberts was very focused for four pages of the transcript on the idea that co-benefits were potentially problematic. Suppose that were true. Suppose co-benefits were problematic. How do we factor that into our allied signal analysis now? Well, we don't think that the court should be reviewing the merits of EPA's proposed finding because it's only a proposal, and this court is not reviewing the merits of a line rule. This is the oddity of the posture, I suppose. We're making some kind of weird, predictive judgment about how the future EPA action will hold up, I guess. Well, I think the court could look at the proposed supplemental finding and note that EPA has proposed several other preferred approaches for evaluating costs that don't focus on the cost-benefit analysis that was done in the prior rule, which did find that the benefits, including co-benefits, far outweigh the costs by tens of billions. The key is the including co-benefits. He referred to that as an end run and bootstrapping and disproportionate. It was all in the context of questions, but he went on and on. I don't know. It's just questions at oral argument, but I assume that's going to be the key battleground. Six months, a year from now, will be whether co-benefits are properly part of the analysis or not. And I don't know what I'm supposed to do with that here. Well, as to the first allied signal factor, the court looks at the likelihood that the agency will be able to address the deficiency on remand, and we have shown that EPA will be able to do that on an expedited schedule, and there's other cost information that EPA will be able to look at in addition to what they're doing now. The only deficiency having been identified being the failure to consider costs, not the question of whether co-benefits are included or not, because the Supreme Court expressly said it was not addressing that, notwithstanding the questions at oral argument. That's right, Your Honor. And I think also under the second allied signal factor, the disruptive consequences, whether or not it was correct for EPA, or it would be correct for EPA, to rely on those co-benefits in the final action, the rule, in fact, does achieve those co-benefits. And so when we point to disruptive consequences, it's not only the very significant harm that is caused by mercury and other hazardous air pollutants that we're pointing to, but also the associated benefits that will result by putting controls on these power plants that are regulated under the rule. So the court factors in the co-benefits in that part of the analysis as well. Why should we ever vacate when it's a notice and comment violation? I'm not sure that issue is before the court. Maybe that's our problem, not yours. Here, I think in past cases where the court has vacated, notwithstanding disruptive consequences, it is because, and this is the NRDC case that joint petitioners mentioned, because the rule could not be resurrected in any recognizable form. And in this case, that's distinguishable because this... But in the notice and comment cases, if it's a failure, inadequate notice, we know to a moral certainty the agency is going to come up with the same rule, and yet we sometimes vacate even though we know it's just a box-checking thing on remand. Again, maybe that's our problem, not yours, but it does strike me. The reason I'm asking is that even if we know that the agency is going to do the same thing on remand here, they're saying, well, sometimes you vacate even in those circumstances, for example, notice and comment kind of cases. Well, I think... I'm not sure how to respond to that, but the difference is a procedural one, and their remedy is to have the opportunity to comment on what the agency is doing. Here, EPA is providing that same process in the action on remand and has been able to show not just with what it's doing now, but what it did in the rule. So there were costs in the record that people had an opportunity to comment on in that part of the rulemaking as well. To then address the second factor of the Allied Signal test, as we and intervener respondents have demonstrated, there are significant public health and environmental effects of vacature. With respect just to mercury, we're talking about brain development in fetuses impaired by methylmercury. We're talking about children's learning disabilities and developmental delays. We're talking about lung and kidney and nervous system damage. We're talking about cancer, and those are just the health consequences. There are other environmental consequences as well. And then we've also put before the court that states have regulatory issues because they have relied on the reductions that will be gained by MATS in several contexts. And also, industry has said to this court that it will be severely disruptive. And I did just want to address one point that Judge Garland was making. We know that Oak Grove is in compliance with the MATS rule, and the other industry groups that were on the joint brief did not put any information before this court of significant harm. And the only one that did that was Tri-State, and we now know that their harm is significantly reduced. And it's important to note that they withdrew their request to the agency for relief. So we have put a wealth of information before the court. Can I add? Sure. I take your point, and this is more for my curiosity. Given the health harms that you're talking about, including the premature deaths and the other things, why are those things not monetizable? That is, why in the original cost description you don't really take those things into account? Those seem like the kind of things that agencies every day attach a monetary consequence to. Well, it's my understanding that it was difficult to quantify those types of effects because of limitations in data and also because of some of the long-term, like cancer has a long-term latency, so it's hard to measure the effects of the pollutants on those kinds of harms. I thought it was your brief. Maybe it's the public health brief that talks about 11,000 premature deaths each year. That seems like something that is... I think that is the co-benefit issue and is quantified in the cost-benefit analysis, which is why the benefits are so significant. I see. Okay. Okay. Thank you. In summary, this Court is sitting in equity and should apply the Allied Signal Test, and because of the wealth of information we put before the Court under both factors and the disparity in that joint petitioners have not put forth any significant harm of maintaining the status quo, we ask for remand without vacature. And you're okay if we say we factor into our analysis that EPA says it's on track to issue the... Yes, and if the Court would like, EPA would be happy to provide status reports if that would assure the Court that EPA will continue to be on track. Thank you. The industry respondent interveners. Thank you. Mr. Collins. Chief Judge Garland, and may it please the Court, thank you. I'm here to represent the only people you will hear from today who actually are in the business that is regulated by this rule, the electric power business. As Chief Judge Garland noted, we have over 75 gigawatts of generation capacity represented by our clients. I think I'd like to focus today, with the Court's permission, on answering the questions of Judge Kavanaugh, what actually is going to happen if a rule gets vacated? Before I do that, though, there's an important issue which we haven't discussed today, which is what are we talking about vacating? We're talking about vacating the finding here today, and EPA, more importantly, is talking about reinstating the finding in four months. So when Judge Garland asks, well, what happens when EPA reinstates the finding in four months, be aware that that is not equal to reinstating the rule in four months if this Court vacates the rule and not merely the finding. It is by no means certain that absent some provision by this Court to make sure it is so, that EPA, if the rule were vacated by the Court now, when it reaffirms the finding in a few months, can resurrect the rule like that. That is by no means certain, and it is certainly a possibility that if the Court were to vacate the rule, and EPA proceeds to reinstate the finding next April, it could still be years before hazardous pollutants from power plants are regulated if EPA has to go back to the drawing board and propose a new rule to fulfill all those Clean Air Act and EPA requirements. Because if the Court vacates the rule, perhaps another provision in its order is void ab initio, and we're back to the drawing board, which is, I think, So, what I'm about to describe as the disruptive... Well, I would imagine that if we did vacate the rule, and four months from now there was a finding, you would come back here and you would not be claiming that they have to start all over again. We certainly wouldn't, Your Honor. You would agree that it would have to go on? That's a pretty big roll of the dice. No, I certainly, we would not be claiming that EPA had to start over. I was agreeing with you, Your Honor. Right, right. But, you know, if the Court vacates now, there may be a possibility for reconsideration. I'm not sure whether the Court will still have jurisdiction if it doesn't retain it explicitly. It's certainly possible for this Court to structure an order vacating the rule that would automatically resurrect it. I think we can note that EPA would move quickly. Well, they would move quickly, but as Ms. Talbert just testified, Your Honor, we can expect, certainly, comments. We don't consider this testimony. She wasn't under oath. Thank you very much, but Ms. Talbert's word is her bond, and I'm sure she spoke the truth in all respects. But we do see that there would be a concerted opposition, perhaps from the same movement petitioners that are moving today. They'd be filing comments. EPA would have to comment. EPA would have to take them. When you have limited time, can you just focus on the practical consequences? You were going to focus on something else. Yes, very good. Thank you, Your Honor. Well, the practical consequences that would extend for however long vacate or last are these. The MATS rule operates as a financial matter to require old, inefficient, dirty power plants to either pony up and add the modern controls that they need to meet modern standards or to retire. As a result of that, the surviving electric power plants are going to expect higher revenues that will justify the higher costs that they will incur in the MATS environment. So when MATS came down, and even before the power industry began to restructure itself so that it took into account the higher revenues that it would receive, and those higher revenues were used to justify or not to justify the investment in the system that is necessary to comply with the law. So were this court to vacate the rule, whether that vacater lasted for four months or three years until EPA replaces the rule, the investment-backed expectation of the electric power industry and all those who have invested in more controls, in new plants, in conversions to gas and so forth are going to be disappointed. And the plants, the power generators that have made those investments are going to find those investments devalued or even entirely stranded because they will be attached to power plants that now, in the lower-price environment that would prevail, if the plants that were going to retire don't retire and don't upgrade, the cost that those upgraded plants will receive will not be sufficient to cover the cost or at least not to meet the reasonable expectation of higher revenues in the post-MATS world. Thank you very much. We'll hear from Ms. Hoffer for the State and City Respondent Interveners. Good morning, Your Honors. Melissa Hoffer, Massachusetts Attorney General's Office, here today on behalf of 19 states and local governments. I'd just like to speak briefly this morning about the heart of this issue for the states, and that is the significant public health and environmental harms that will occur if the rule is vacated. The eight unrebutted declarations that accompanied EPA's and the state's and public health interveners' motions to govern today show that if the rule is vacated, the protections that are already being achieved right now would be significantly diminished. So I wanted to give you a very practical example of what that means in terms of the mercury emissions specifically. The rule affords a 20-ton per year decrease in mercury emissions, and if the rule is vacated based on the evidence that you have before you from our declarations, that would be reduced to approximately five to eight tons per year, which is less than half of the reductions. The evidence also shows that the excess emissions of not only mercury but also acid gases and the nonmercury metals translate into tangible harms to real people fairly immediately. In addition to that, our ability as states to comply with other important federal regulatory programs would be compromised, and I just wanted to give you a few examples of those this morning. So several of our states are located in the northeast, which has often been referred to as the tailpipe of the country because of the path of prevailing winds. You want your citizens to know that that's how you vote. It is true. It is true. I am sorry to say. I live there. And many of us have passed power plant mercury regulations that are much more stringent than Matt's, yet we're still unable to attain our state water quality goals. And what that means, just in real terms, is that there are millions of acres of ponds and lakes and there are thousands of miles of streams and rivers that are polluted with mercury. So they're impaired from mercury under the Clean Water Act. States then therefore have to develop pollution budgets or total maximum daily loads. They're supposed to lay out how we attain those standards. But we really simply can't do it. So, for example, the total maximum daily load for the northeast states found that it would not be possible to return fish tissue concentrations of mercury to safe levels without reducing significant out-of-region mercury sources. And it specifically called, the states in that TMDL specifically called for nationwide regulation of mercury emissions. And the same is true of Minnesota's TMDL. Because certain air pollution controls that are required by the rule also have the effect of reducing sulfur dioxide and particulate matter emissions, the states will also be relying on that rule to help achieve compliance with national ambient air quality standards for sulfur dioxide and for particulate matter. And that's also true with respect to meeting the goals of the Regional Haze Program. And I refer you to our brief for more details since I know my time is limited. No, actually it's up. Thank you. Unless there are questions from the bench. Thank you so much, Your Honors. I appreciate it. Sean Donahue for the Environmental and Public Health Organization, respondent and intervener. Good morning, Your Honors. Thank you. I just want to make four quick points, auctioneer style, and then one broader observation. The sugar cane growers case involved not just a notice and comment violation but also a failure by the Department of Agriculture to make findings required under the statute as a precondition for that grant program. And that was found by the court to be unlawful. So it's, in that respect, not just a notice and comment case. The movements for vacature claim that this case involves peculiarly a failure of authority. And I think the court raised some questions about how you distinguish this from other cases. I think those are well-founded. But I think, you know, a case like the New Jersey case involving the Clean Air Mercury Rule, where this court found that the agency couldn't regulate a listed hazardous pollutant under the program it was trying to use, is an example. There was nothing EPA could do to fix that program, and therefore vacature was appropriate. This is very different, as is evidenced by the fact that the Supreme Court invoked Chenery and said there are some arguments made that might even be ones that could be upheld, but they're not ones EPA made contemporaneously. Very different situation. The court didn't question that EPA has the power to regulate hazardous air pollutants and might even be able to use the rationales offered in the briefs. The idea that the Allied Signal Doctrine is somehow an aberration or a wrong turn by this court, we think it's binding even if that were so. There are so many cases, EPA cases and otherwise, but we think it's squarely within the tradition of equity that judicial review of agency action comes from. There are so many cases, for example, the line Romero-Barcello, Village of Gambell, Winter, and Monsanto cases where the Supreme Court has said you don't automatically enjoin agency action when there's a violation of statute. You look at the consequences, and that's very much in line with the equitable tradition. One more quick legal point. Co-benefits, very interesting question. It was a subject of discussion at the Supreme Court argument. Note that this EPA's proposed finding does not rely on co-benefits. The primary rationales, and all this is tentative, and the agency is going to hear from everyone about it, but their primary rationales are this program, these restrictions on pollution, will reduce hazardous air pollutants that Congress really wanted to reduce. Even acting as an auctioneer you're over. Okay. Further questions? If there are no questions, I'll. Thank you. Thank you very much. All right. And is there reserved time? All right. We're going to round you up to two minutes because you had so many others to face. Thank you, Your Honor. We're not asking that allied signal be thrown out. We're saying it doesn't apply in certain limited circumstances, and while equity is the important principle, equity follows the law, and the fact that the agency doesn't have authority should matter a lot to the equitable analysis even. So with respect to the practical consequences, some of the consequences that people are fighting over are economic consequences, and these are about essentially whose ox is getting gored, which side of the industry. Those who have asked for extensions and fought this rule because they thought it was unlawful and it turns out they were right or that they should take on additional consequences. And for which it's our own problem, that is the panel made a mistake in the majority. We apologize to the extent we can. But we're still wherever we are now. We are, and I guess I'm not trying to attack the panel. My point is merely that that is part of the equitable picture that the court needs to look at, that there has been that economic in the past. As to the health, as they recognize that there's no deaths that are being caused by mercury, they haven't alleged that ever. Mercury comes from the particulate matter, so it goes to the co-benefits issue. But that is an issue that this is no longer a question of authority, right? The only issue the court decided was you had to consider costs. The question of whether in considering costs they can consider co-benefits, if you think that's an authority issue, then everything has to be an authority issue. I don't think that's an authority issue. You don't? I'm fitting that within the allied signal analysis, that to the extent you're looking at the disruptive consequences, you should think about which consequences are relevant ones and which ones are relevant should be guided by what the statute's addressing. This is a statute that's about hazardous air pollutants, so you'd think the disruptive consequences that are based on health would look at the disruptive consequences of hazardous air pollutants, which is why I returned that $4 million to $6 million, which is the quantifiable amount that's tied to the hazardous air pollutant issue, which is mercury. So I think that's relevant on the health benefit side of it. And as to the seriousness of the deficiency, the error is not something that can be cured, it's the lack of authority. They're going to start over. They will have authority in the future once they do it right, but you can't cure the lack of authority they've had in the past, which is why this is kind of an unusual thing to try to apply in the allied signal context in the first place. And I thought my time was up, but I guess I have a little bit more. No, you're over now, actually. Oh, that's coming up. I apologize. That's all right. Let me just ask if anybody on the panel has any more questions. All right, thank you. Very good argument on all sides. We appreciate it. We'll take it under submission.
judges: Garland, Rogers, Kavanaugh